**CASE NO. 23-4**

## IN THE

# United States Court of Appeals
## FOR THE FOURTH CIRCUIT

STEPHEN COREY BRYANT,

*Petitioner-Appellant,*

v.

BRYAN P. STIRLING, Commissioner, South Carolina
Department of Corrections; LYDELL CHESTNUT, Deputy Warden,
Broad River Road Correctional Institution Secure Facility,

*Respondents-Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA AT BEAUFORT

**OPENING BRIEF OF APPELLANT**

John G. Baker
FEDERAL PUBLIC DEFENDER
FOR THE WESTERN DISTRICT
OF NORTH CAROLINA

Gretchen L. Swift
Laura K. McCready
Assistant Federal Public Defenders
129 West Trade Street, Suite 300
Charlotte, NC 28202
704-374-0720
gretchen_swift@fd.org
Laura_McCready@fd.org

E. Charles Grose, Jr.
GROSE LAW FIRM, LLC
305 Main Street
Greenwood, SC 29646
864-538-4466
charles@groselawfirm.com

Jonathan P. Sheldon
SHELDON & FLOOD, PLC
10621 Jones Street
No. 301-A
Fairfax, VA 22030
703-691-8410
JSheldon@sfhdefense.com

*Counsel for Appellant*

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ...................................................................... iii

INTRODUCTION ....................................................................................... 1

STATEMENT OF JURISDICTION .......................................................... 2

ISSUES PRESENTED ................................................................................ 2

STATEMENT OF THE CASE .................................................................... 3

    A.   Trial, Direct Appeal, and Initial PCR .............................................. 3

    B.   Federal Habeas Petition and Second PCR ...................................... 4

STATEMENT OF FACTS .......................................................................... 12

    A.   Bryant's Brain Damage .................................................................. 12

    B.   FASD, Intellectual Disability, and the Limitations of IQ
        Testing .......................................................................................... 14

    C.   Trauma and FASD ........................................................................ 18

SUMMARY OF THE ARGUMENT ........................................................... 20

STANDARD OF REVIEW ......................................................................... 23

ARGUMENT ............................................................................................... 23

    I.    The federal courts can consider the merits of Bryant's
        claim because the procedural rules the state court relied
        upon to bar relief were inadequate to support the
        judgment ...................................................................................... 23

A.    Procedural default does not apply because there is no clear rule governing the amendment of a successive PCR application................................................................. 25

B.    Procedural default does not apply because there is no clear rule barring successive PCR applications raising ineligibility for execution ...................................... 27

II.    The state court's refusal to allow Bryant's amendment was not an adjudication on the merits ................................................. 32

III.    Construed as a merits ruling, the state-court decision violated clearly established law by refusing to consider current medical standards to determine whether Bryant's FASD renders him constitutionally ineligible for execution ......... 36

A.    Supreme Court precedent clearly establishes that courts must consult current medical standards when determining who is exempt from execution under the Eighth Amendment .............................................................. 37

B.    The district court erred when it concluded that the PCR court considered the medical and scientific evidence regarding Bryant's FASD ......................................... 39

C.    The PCR court violated clearly established law by refusing to consider the scientific evidence that Bryant's FASD is functionally equivalent to an intellectual disability ............................................................... 41

CONCLUSION ............................................................................................ 44

REQUEST FOR ORAL ARGUMENT ......................................................... 44

CERTIFICATE OF COMPLIANCE ............................................................. 46

ii

# TABLE OF AUTHORITIES

## Cases

*Ake v. Oklahoma,*
    470 U.S. 68 (1985) ................................................................. 32

*Atkins v. Virginia,*
    536 U.S. 304 (2002) ......................................................... *passim*

*Barr v. City of Columbia,*
    378 U.S. 146 (1964) ............................................................... 27

*Bostick v. Stevenson,*
    589 F.3d 160 (4th Cir. 2009) ............................................... 31

*Bourgeois v. Watson,*
    141 S. Ct. 507 (2020) ........................................................... 38

*Brady v. Maryland,*
    373 U.S. 83 (1963) ................................................................. 11

*Bryant v. South Carolina,*
    577 U.S. 1012 (2015) .............................................................. 4

*Busby v. Davis,*
    925 F.3d 699 (5th Cir. 2019) ............................................... 32

*Coleman v. Thompson,*
    501 U.S. 722 (1991) .............................................................. 24

*Edward Lee Elmore v. State,*
    Greenwood County Case Number 2005-CP-24-1205 .......................... 29

*Enmund v. Florida,*
    458 U.S. 782 (1982) .............................................................. 38

*Ford v. Wainwright,*
    477 U.S. 399 (1986) .............................................................. 38

*Foster v. Chatman,*
    578 U.S. 488 (2016) .............................................................. 32

*Frye v. Lee,*
    235 F.3d 897 (4th Cir. 2000) ............................................... 23

*Gordon v. Braxton*,
    780 F.3d 196 (4th Cir. 2015) ........................................................ 34, 35

*Hall v. Florida*,
    572 U.S. 701 (2014) ....................................... 1, 37, 38, 43, 44

*Hathorn v. Lovorn*,
    457 U.S. 255 (1982) ................................................................. 24, 27

*House v. Bell*,
    547 U.S. 518 (2006) ................................................................... 23

*James v. Kentucky*,
    466 U.S. 341 (1984) ........................................................ 24, 29, 31

*Jones v. Sussex I State Prison*,
    591 F.3d 707 (4th Cir. 2010) .......................................... 24, 31

*Lambrix v. Singletary*,
    520 U.S. 518 (1997) ................................................................... 24

*Love v. State*,
    834 S.E.2d 196 (S.C. 2019) ..................................................... 26

*McNeill v. Polk*,
    476 F.3d 206 (4th Cir. 2007) ................................................ 36

*Moore v. Texas*,
    581 U.S. 1 (2017) .............................................................. 37, 38

*Rhines v. Weber*,
    544 U.S. 269 (2005) .................................................................... 7

*Richardson v. Kornegay*,
    3 F.4th 687 (4th Cir. 2021) .................................................. 33

*Roper v. Simmons*,
    543 U.S. 551 (2005) ................................................... 38, 41, 42

*Simpson v. Moore*,
    627 S.E.2d 701 (S.C. 2006) ..................................................... 26

*State v. Bryant*,
    704 S.E.2d 344 (S.C. 2011) .......................................... 3, 4, 20

*Thomas v. Davis*,
   192 F.3d 445 (4th Cir. 1999) ........................................................... 26, 27

*Valentino v. Clarke*,
   972 F.3d 560 (4th Cir. 2020) ............................................................. 33

*Williams v. Stirling*,
   914 F.3d 302 (4th Cir. 2019) ............................................................. 39

*Williams v. Taylor*,
   529 U.S. 362 (2000) ............................................................................ 36

*Winston v. Kelly*,
   592 F.3d 535 (4th Cir. 2010) ..................................................... 33, 34, 35

*Winston v. Pearson*,
   683 F.3d 489 (4th Cir. 2012) ........................................................ 33, 34

*Woods v. State*,
   No. 2019-MO-044, 2019 WL 6898088 (S.C. Dec. 18, 2019) .......... 29, 30

## Statutes

28 U.S.C. § 1291 ................................................................................ 2

28 U.S.C. § 2241 ............................................................................... 2

28 U.S.C. § 2253 ............................................................................... 2

28 U.S.C. § 2254 ....................................................................... *passim*

S.C. Code Ann. § 16-3-20 ............................................................... 4

S.C. Code Ann. § 17-27-45 ............................................... 25, 28, 30

S.C. Code Ann. § 17-27-70 ........................................................... 25

S.C. Code Ann. § 17-27-90 ..................................................... 25, 28

## Other Authorities

2 Randy Hertz & James S. Liebman, *Federal Habeas Corpus Practice and Procedure* (7th ed. 2015) ........................................................ 24

Ann P. Streissguth et al., *Risk Factors for Adverse Life Outcomes in Fetal Alcohol Syndrome and Fetal Alcohol Effects*, 25 Dev'l and Behav. Pediatrics (2004) ...................................................... 15-16

Centers for Disease Control and Prevention, FASD Homepage, *Basics about FASDs* ............................................... 14

Centers for Disease Control and Prevention, FASD Homepage, *FASDs: Treatments* ..................................... 18

Jerrod M. Brown et al., *Fetal Alcohol Spectrum Disorders (FASD) and Competency to Stand Trial (CST)*, 52 Int'l J. L. & Psychiatry (2017) ........................................... 15

National Institute of Health, Understanding Fetal Alcohol Spectrum Disorders ................................................ 12

S.C. R. Civ. P. 15 ....................................... 25

Stephen Greenspan et al., *Determining Disability Severity Level for Fetal Alcohol Spectrum Disorder: Assessing the Extent of Impairment, in Evaluating Fetal Alcohol Spectrum Disorders in the Forensic Context* (2022) ................................ 16

## INTRODUCTION

Catherine Bryant abused alcohol and drugs while pregnant with Stephen Corey Bryant. These toxins permanently damaged her son's developing brain, leaving Bryant profoundly impaired with Fetal Alcohol Spectrum Disorder (FASD). Although Bryant's IQ scores are marginally above the standard range for an intellectual disability diagnosis, the medical consensus is that IQ scores do not adequately capture the functional deficits caused by FASD. In fact, experts in neuropsychiatry agree that Bryant's impairments are, in every meaningful regard, indistinguishable from intellectual disability.

When neuropsychological testing revealed his deficits, Bryant's attorneys moved to amend his application for state post-conviction relief to allege that his execution would violate the Constitution under *Atkins v. Virginia*, 536 U.S. 304 (2002), and *Hall v. Florida*, 572 U.S. 701 (2014), because his FASD is functionally equivalent to intellectual disability. But, ignoring the current scientific understanding of FASD, the state court refused to consider Bryant's FASD-based *Atkins* claim. To prevent Bryant from being put to death in violation of the Constitution, this Court should remand to the district court for consideration of whether Bryant lacks

1

sufficient culpability for a death sentence to comport with Eighth Amendment.

## STATEMENT OF JURISDICTION

This is an appeal from a final order of the United States District Court for the District of South Carolina denying relief in capital habeas proceedings and granting a certificate of appealability. The district court had jurisdiction under 28 U.S.C. §§ 2241 and 2254. This Court has jurisdiction under 28 U.S.C. §§ 1291 and 2253.

On October 18, 2022, the district court dismissed Bryant's amended petition for writ of habeas corpus and granted a certificate of appealability for Ground Seven of Bryant's amended petition. JA1130-1165. On May 11, 2023, it denied both parties' Motions to Alter or Amend. JA1199-1227. Bryant filed a Notice of Appeal on June 7, 2023. JA1228.

## ISSUES PRESENTED

1)    The doctrine of procedural default bars federal habeas review only when a petitioner has failed to comply with a clearly applicable state-court rule. In refusing to allow Bryant to amend his second application for post-conviction relief, the state court relied on procedural rules that are not regularly applied in that context. Did the district court err in deciding that the dismissal was based on an adequate state procedural rule?

2

2)    Judgment on a materially incomplete record is not an adjudication on the merits under 28 U.S.C. 2254(d). The state court relied on procedural rules when it refused to hear Bryant's FASD-based *Atkins* claim, and it declined to consider Bryant's proffered evidence that his FASD is functionally equivalent to intellectual disability. Did the district court err in construing the state-court decision as an adjudication on the merits?

3)    The Supreme Court has held that the adjudication of eligibility for execution under *Atkins v. Virginia*, 536 U.S. 304 (2002), must be informed by prevailing clinical standards. Construed as a merits ruling, the state court decided that *Atkins* does not bar Bryant's execution without considering the medical evidence that, in a case like Bryant's, impairment caused by fetal alcohol exposure is functionally equivalent to intellectual disability. If considered an adjudication on the merits, did the state-court ruling violate clearly established law?

## STATEMENT OF THE CASE

### A. Trial, Direct Appeal, and Initial PCR

Bryant was indicted for three burglaries, armed robbery, arson, possession of a stolen handgun, assault and battery with intent to kill, and the murders of Willard Tietjen, Clifton Gainey, and Clarence Burgess. *See State v. Bryant*, 704 S.E.2d 344, 345 (S.C. 2011); JA348-352. He pled guilty

3

to all charges, *Bryant*, 704 S.E.2d at 345, which cost him the right under

South Carolina law to be sentenced by a jury, *see* S.C. Code Ann. § 16-3-

20(b) (requiring capital sentencing proceedings to take place before the

trial judge if the defendant pleads guilty). Bryant's trial team presented no

mitigation evidence of his FASD. The judge sentenced Bryant to death for

the murder of Mr. Tietjen and life without the possibility of parole for the

murders of Mr. Gainey and Mr. Burgess. JA348-352.

Bryant's attorneys appealed a single evidentiary issue to the South

Carolina Supreme Court, which affirmed the convictions and sentences.

*Bryant*, 704 S.E.2d at 346.

Bryant sought post-conviction relief (PCR) on the grounds that his

trial counsel was ineffective and that the state failed to disclose exculpatory

evidence. JA1063-1064; JA1132. The PCR court denied relief. JA1132.

Bryant then filed a petition for a writ of certiorari to the South Carolina

Supreme Court, and then the United States Supreme Court, both of which

were denied. JA1132; *Bryant v. South Carolina*, 577 U.S. 1012 (2015).

## B. Federal Habeas Petition and Second PCR

On April 28, 2016, Bryant filed the operative federal habeas petition

pursuant to 28 U.S.C. 2254 alleging, among other things, that his execution

is barred by *Atkins v. Virginia*, 536 U.S. 304 (2002). JA16-98. Less than a week later, on May 3, 2016, Bryant filed two successive PCR applications in the Court of Common Pleas for Sumter County, South Carolina. The first alleged that Bryant is intellectually disabled and that his execution would therefore violate the Eighth and Fourteenth Amendments under *Atkins* and *Hall*. JA429-435. The second application asserted four additional grounds for relief. JA99-107.

Bryant supported his PCR application with the affidavit of Dr. Donna Schwartz Maddox,[1] who evaluated Bryant before his sentencing and first PCR hearings and testified at both proceedings. JA436-437. Dr. Schwartz Maddox declared that, during her prior evaluations and testimony, she did not know that:

- Bryant's mother drank alcohol and smoked marijuana while pregnant with him;

- Bryant was late meeting his developmental milestones;

- Bryant always struggled in school, and his first-grade teacher told his mother "that he was not fit for school, couldn't begin to learn how to read, and would fail the first grade";

---

[1] Dr. Schwartz Maddox used her prior surname, Schwartz-Watts, in some state-court proceedings. JA793-794.

- Bryant was promoted out of fifth grade only because the school had a policy against holding students back.

JA436-437. Dr. Schwartz Maddox declared that she "incorrectly testified [at Bryant's sentencing hearing] that he did not meet the criteria for Intellectual Disabilities (then referred to as Mental Retardation)." JA436. She explained that she was not a psychologist and had "not received any specialized training in assessing someone for Intellectual Disabilities." JA437. She reported that she had previously failed to recognize an intellectual disability in a different capital defendant. JA437. And she related her professional opinion that Bryant needed full assessments for intellectual disabilities and FASD, plus a complete battery of neuropsychological testing. JA437.

The State moved to dismiss both actions as improperly successive and time barred. JA108-121, JA438-451. After a hearing, the PCR court granted the state's motion to dismiss the third PCR application, but—as discussed more thoroughly in the Argument section below—held that the second application (raising the *Atkins* claim) was not procedurally barred. JA122-135, JA806-812.

After the state court allowed Bryant's second PCR application to proceed, the federal district court stayed the federal habeas proceedings

6

pursuant to *Rhines v. Weber*, 544 U.S. 269 (2005), to allow Bryant to exhaust his state-court remedies. JA1132.

Bryant then underwent the multidisciplinary evaluation his trial team failed to pursue, including:

- A neuropsychological evaluation by forensic psychiatrist Dr. George W. Woods, who concluded that "Bryant has a medical, neuropsychological, and social history consistent with Fetal Alcohol Spectrum Disorder" and "demonstrates long-term adaptive dysfunction which is consistent with and equivalent to the requirements of Intellectual Disorder," JA537;

- A neurological examination by medical doctor Julian Davies, which revealed "multiple signs of neurologic disorder" and "multiple physical signs which are consistent with [prenatal] alcohol exposure," JA528, JA534;

- An adaptive functioning evaluation by psychologist Dr. Caroline Everington, which yielded "composite findings indicat[ing] that Mr. Bryant's adaptive functioning is consistent with those of intellectually disabled persons," JA535; and

- Neuropsychological testing by medical doctor Paul Moberg, which "documented cognitive deficits consistent with Fetal Alcohol Spectrum Disorder," JA528.

Based on these evaluations, Dr. Woods concluded that—though Bryant's documented IQ scores between 79 and 93, JA660, were "marginally above those required to meet the criteria for intellectual disability"—alcohol exposure in utero damaged Bryant's developing brain and left him with deficiencies on par with intellectual disability. JA528, JA537.

On May 18, 2018, Bryant moved to amend his surviving PCR application to allege that his execution would violate the Eighth Amendment under *Atkins* and *Hall* because—although not diagnosed with intellectual disability—his FASD caused impairments akin to intellectual disability. JA518, JA521-522. Bryant noted that "the information concerning FASD was developed during the natural course of investigation of Intellectual Disabilities because the two disorders involve significant overlaps." JA522. He alleged that "FASD is present during the developmental period, and people suffering from FASD suffer from impairments to an equal or greater exten[t] as people suffering from Intellectual Disabilities." JA521-522. After a hearing, JA571-594, the PCR

court denied the motion to amend, holding that the FASD-based *Atkins* claim was improperly successive and untimely. JA382-386.

On October 1, 2018, the PCR court held an evidentiary hearing on the *Atkins* claim as originally presented. Bryant presented testimony from three experts: Dr. Woods (JA597-732); Dr. Everington (JA733-791); and Dr. Maddox (JA793-802). Bryant's experts testified that, as a result of exposure to alcohol in utero, Bryant suffers from cognitive, adaptive, and neurodevelopmental deficits that are functionally indistinguishable from intellectual disability. JA633, JA 636-637, JA756-758. The state called no witnesses. JA803.

Because the court had already denied Bryant's motion to amend his application to include the FASD issue, the hearing was limited to the question of intellectual disability diagnosis, JA380-381, JA597-598, even though Bryant's attorneys had already provided an expert report stating that Bryant's IQ was marginally above the cutoff for intellectual disability, JA528.

At the beginning and end of the hearing, Bryant renewed his motion to amend his PCR application to allege that his execution would violate the Eighth and Fourteenth Amendments because his FASD is functionally equivalent to intellectual disability. JA598, JA803. The PCR court denied

9

leave to amend and, over Bryant's objections, adopted the state's proposed order denying post-conviction relief. JA387-426. In doing so, the court acknowledged that Bryant "may suffer from some form of FASD or associated condition, and may have an impaired brain." JA416. It nevertheless declined to consider whether Bryant's FASD might render his execution unconstitutional, reiterating that it was "only [intellectual disability] that is the basis of this litigation and only that condition that needs to be proven." JA416. Bryant appealed the denial of his motion to amend to the South Carolina Supreme Court. JA813-847. The state filed a cross-appeal asking the state supreme court to clarify the procedural rules surrounding successive PCR applications raising claims under *Atkins*. JA849-866. The South Carolina Supreme Court declined to hear either appeal. JA868.

Upon returning to federal district court, the State filed an amended motion for summary judgment, JA869-957, and Bryant filed a traverse, JA958-1035. In a Report and Recommendation, the Magistrate recommended that the district court grant the state's motion for summary judgment and dismiss Bryant's petition. JA1061-1128. On the FASD-based *Atkins* claim, the Magistrate recommended that the district court apply the doctrine of procedural default, reasoning that the PCR court refused to

10

consider the claim because it violated the statute of limitations and the rule limiting successive applications. JA1120-1124. The district court departed from the Magistrate's recommendation by holding that the claim was not procedurally defaulted because the PCR court's denial of Bryant's motion to amend was based in part on federal law. JA1155-1160. It nevertheless construed the PCR court's ruling as an adjudication on the merits and held that the decision was not contrary to clearly established law under 28 U.S.C. § 2254(d). JA1159-1160. The district court otherwise adopted the Report and Recommendation, granted the state's motion for summary judgment, and denied habeas relief. JA1164-1165. It granted a certificate of appealability on "whether the court's decision on Mr. Bryant's *Atkins* claim should have been resolved in a different manner." JA1164. Both parties filed Motions to Alter or Amend, JA1166-1180, JA1181-1185, which were denied on May 11, 2023, JA1199-1227.

Bryant timely appealed the denial of his petition, JA1228, and this appeal followed. On June 30, 2023, Bryant moved to expand the certificate of appealability to include a claim under *Brady v. Maryland*, 373 U.S. 83 (1963), and a claim that his trial counsel was ineffective for failing to investigate and present evidence of his FASD, *see* Docket Entry 19, but that motion was denied, Docket Entry 23.

11

## STATEMENT OF FACTS

The term FASD describes the range of lifelong physical, behavioral, and cognitive impairments caused by prenatal alcohol exposure.[2]  This section of the brief summarizes the current medical consensus about FASD and details how Bryant's particular impairments manifested.[3]

### A. Bryant's Brain Damage

Bryant's mother, who met his father in a drug rehabilitation program, acknowledges drinking and using drugs during her pregnancy. JA436, JA612.

Alcohol exposure in utero can harm various regions of the brain, depending on which brain structures are developing when the pregnant woman drinks alcohol. During the PCR process, medical experts discovered that at least two of Bryant's brain structures are malformed. Neuropsychological testing revealed damage to his right frontal lobe, which controls executive functioning. JA515-516, JA534, JA621-622. The frontal

---

[2] *See* National Institute of Health, Understanding Fetal Alcohol Spectrum Disorders, https://www.niaaa.nih.gov/publications/brochures-and-fact-sheets/understanding-fetal-alcohol-spectrum-disorders (last visited Apr. 1, 2024).

[3] The PCR court declined to make factual findings either about the condition of FASD generally or about Bryant's FASD and its equivalence with intellectual disability. JA1183. This section therefore draws on Bryant's experts' reports and testimony, which the PCR court ultimately refused to consider.

12

lobe is "the area of the brain that allows someone to understand the big picture." JA516. Neuropsychological testing also revealed damage to Bryant's corpus callosum, JA534, JA611, which is the structure that separates the two hemispheres of the brain and enables communication between them, JA610-611.

This brain damage has left Bryant with significant cognitive deficits. JA528. Bryant's cognitive impairments were immediately apparent to his evaluators; for example, he is consistently unable to report his full date of birth. JA 531, JA533, JA606-607. Bryant demonstrates poor working memory and impaired processing, both abilities that are crucial to being able to weigh and deliberate. JA533. He has poor executive sequencing and an impaired ability for abstract thinking. JA516. His cognitive deficits also include poor grasp of language. JA739-740.

Alcohol exposure in utero can also cause dysmorphology, or improperly developed bones. JA609. To this day, these hallmarks of FASD are visible in Bryant: the right side of his head is misshapen, his eyes are noticeably small, and he is small in stature. JA516, JA609-611.

Bryant also suffered dysmorphology in the bones of his face. Facial features typically develop between the 17th and 20th days of pregnancy and can be distorted by alcohol exposure. JA609.  For example, one sign of

13

FASD is "a smooth ridge between the nose and upper lip."[4] While the telltale facial features of FASD typically fade in adulthood, experts can sometimes identify them in childhood photographs. JA691-692. Bryant's childhood photos reveal, in Dr. Woods' opinion, "about as classic a picture of Fetal Alcohol Spectrum Disorder as one could get." JA727.  Based on the results of Bryant's testing, the doctors diagnosed him with static encephalopathy, alcohol induced, which is under the FASD umbrella. JA534, JA623-624.

### B. FASD, Intellectual Disability, and the Limitations of IQ Testing

When the Supreme Court decided *Atkins*, the medical community's diagnostic criteria for intellectual disability were three: significantly sub-average intellectual functioning, deficits in adaptive functioning, and onset of these deficits during the developmental period. *See Atkins*, 536 U.S. at 308 n.3. By definition, FASD involves deficits in adaptive functioning and onset during the developmental period. And—as Bryant's experts explained—recent discoveries about IQ testing in people with FASD have caused the medical community to reject the idea that, in a case like

---

[4] Centers for Disease Control and Prevention, FASD Homepage, *Basics about FASDs*, https://www.cdc.gov/ncbddd/fasd/facts.html (last visited Apr. 1, 2024).

Bryant's, there is any clinically significant distinction between FASD and intellectual disability. JA536, JA628-629.

The current medical understanding, presented to the PCR court by Bryant's experts, is that IQ testing fails to capture the real-world impairments caused by FASD. While IQ testing approximates conceptual functioning, adaptive functioning testing measures how people actually operate in society. JA511, JA536. In general, people's IQ scores tend to predict their adaptive functioning, but that is not true for people with FASD. JA537. In fact, "a defendant with FASD whose full-scale IQ is 100 may function adaptively like someone with an IQ of 70." Jerrod M. Brown et al., *Fetal Alcohol Spectrum Disorders (FASD) and Competency to Stand Trial (CST)*, 52 Int'l J. L. & Psychiatry 19, 23 (2017) (citations omitted). "The significant discrepancy between IQ and adaptive functioning is a hallmark characteristic in FASD." *Id.*; *see also* JA536-537. Studies show that, for people with FASD, adaptive deficits are 1 to 1.5 standard deviations below their respective mean IQ scores, which is "a debilitating functional deficit that would probably not be detected in routine IQ testing." Ann P. Streissguth et al., *Risk Factors for Adverse Life Outcomes in Fetal Alcohol Syndrome and Fetal Alcohol Effects*, 25 Dev'l and Behav. Pediatrics 228,

15

235 (2004). In other words, the presence of FASD undermines the accuracy of an IQ score as it pertains to real-world functioning.

As Bryant's experts explained, the medical community now recognizes that—in cases like Bryant's—the cognitive, practical, and social impairments caused by FASD are indistinguishable from those of intellectual disability. JA536-537, JA630-633, JA758-760; *see also* Stephen Greenspan et al., *Determining Disability Severity Level for Fetal Alcohol Spectrum Disorder: Assessing the Extent of Impairment, in Evaluating Fetal Alcohol Spectrum Disorders in the Forensic Context* (2022) ("[T]here are few disorders more related to ID (both in causing that disorder and resembling it functionally) than FASD.").

Objective testing revealed this pattern in Bryant: Although his IQ scores are marginally above the range for an intellectual disability diagnosis, his functioning in society is indistinguishable from that of someone with intellectual disability. JA536-537, JA636-637, JA758-760. From a young age, Bryant struggled with language and communication in ways typical of people with intellectual disabilities. JA748, JA756-758. This language deficit is "apparent in everyday life." JA516. Bryant was never able to acquire the necessary skills for living independently, and he needed help "managing the day-to-day life demands," which is a "very typical pattern for

16

people with cognitive and intellectual disabilities." JA750; *see also* JA506, JA536-537, JA758. Bryant has life-long difficulty reading and understanding social cues, interacting with peers, and forming age-appropriate relationships. JA535, JA752-754. From an early age, Bryant struggled with impulsivity and time management, and he was unable to plan and set goals. JA753, JA756-757. He has "difficulty in regulating his emotions [and] controlling anger." JA753. And he has always had diminished capacity to exercise judgment, understand consequences, and conform his behavior to the law. JA536-537, JA752.

Bryant's IQ scores, though low, "say little about his ability to function in the world." JA537. Instead, "there is every indication that he functions as poorly as someone meeting the diagnosis of Intellectual Disorder, including that he has functioned at this level during his developmental period." JA537. According to Dr. Everington, an expert in intellectual disabilities, JA736, Bryant's "adaptive behavior pattern is completely consistent with someone with intellectual disability." JA758. For this reason, Dr. Woods explained that, from a clinical perspective, Bryant should be treated like someone with an intellectual disability. JA536, JA633. Indeed, Bryant's Fetal Alcohol Spectrum Disorder is "cognitively, adaptively, and functionally equivalent to Intellectual Disability." JA537.

17

### C. Trauma and FASD

The medical community now recognizes that the deficits associated with FASD are exacerbated in patients with trauma histories. As Dr. Woods explained to the PCR court, a child with FASD who experiences familial violence, lack of support, and trauma is even more vulnerable to the effects of the brain impairment caused by alcohol exposure in utero. JA613-614. The CDC likewise recognizes that "having a loving, stable home environment is very important for a child with an FASD," and that "[p]eople with FASDs who live in stable, non-abusive households or who do not become involved in youth violence are much less likely to develop secondary conditions than children who have been exposed to violence in their lives."[5]

Bryant's household was neither stable nor non-abusive. He suffered overwhelming trauma as a child. He was physically and sexually abused by his mother, grandfather, uncle, and half-brother. JA193, JA204-205, JA221-222, JA229, JA284-285. And the sexual abuse extended beyond Bryant's family. Bryant's mother remembers a day when Bryant returned home from an adult male neighbor's home with "blood in his underwear."

---

[5] Centers for Disease Control and Prevention, FASD Homepage, *FASDs: Treatments*, https://www.cdc.gov/ncbddd/fasd/treatments.html (last visited Apr. 1, 2024).

18

JA87. About a year later, while in custody after a juvenile arrest, Bryant was again raped by an adult male. JA87.

Given his neuropsychological deficits and severe trauma history, it is not surprising that Bryant struggled developmentally, socially, and academically from an early age. He missed developmental milestones and was slow to talk and walk. JA612. He performed poorly in school and was required to repeat the first grade. JA222. During elementary school, he received numerous psychological evaluations and was placed in classes for handicapped children. JA222-223.  By age eleven, Bryant was institutionalized in the Department of Juvenile Justice. JA226. By fourteen, Bryant still showed developmental delays and had trouble socializing. JA239. By fifteen, he was diagnosed with chronic depression and proscribed Prozac. JA226. At seventeen, he was indicted for nonviolent burglary. JA152-153. After his second burglary indictment later that year, he was incarcerated for nearly four years. JA156-157.

When he was 22 years old, Bryant started experiencing recurring intrusive thoughts about the childhood sexual abuse inflicted upon him by his family members. JA230, JA233. In August of 2004, Bryant sought help for his flashbacks, first reporting the sexual abuse to his paternal grandmother. JA193-195. He then reported the sexual abuse to his

probation officer and asked for her help obtaining counseling. JA184.

Bryant's probation officer referred him to Healthy Minds, a mental health

provider, but he could not afford to pay the $75 cost to receive treatment

there. JA230. In September 2004, Bryant tried to get help at the YWCA in

Sumter, South Carolina, where he reported the childhood sexual abuse,

neglect, and his current problems sleeping. JA185, JA229. Just weeks later,

Bryant began the eight-day course of conduct that led to his capital

conviction. *See Bryant*, 704 S.E.2d at 344-45.

## SUMMARY OF THE ARGUMENT

The uncontroverted evidence before the PCR court was that Mr.

Bryant's FASD impairs him in ways that are "cognitively, adaptively, and

functionally equivalent to Intellectual Disability." JA537. No court has

grappled with that evidence, however, as the PCR court misapplied a

procedural rule to preclude review. The district court failed to recognize the

inadequacy of the state-court procedural rules. And although the district

court acknowledged that the state-court ruling was dependent on federal

law, it misconstrued the state-court ruling as a merits adjudication owed

deference under the Antiterrorism and Effective Death Penalty Act

(AEDPA). The result is that no court has considered whether—because

Bryant's FASD is functionally equivalent to intellectual disability—the

20

Eighth Amendment forbids his execution. The district court committed three errors of law:

*First*, the district court failed to identify the inadequacies of the rule invoked by the PCR court to bar Bryant's FASD-based *Atkins* claim. Bryant did not seek to file a new PCR application; rather, he sought to amend a claim within a pending application. When it comes to the amendment of successive PCR applications or the relation back of amended claims, not only are there no clearly established or regularly applied state rules, there are no rules whatsoever. Moreover, even if Bryant's proposed amendment is considered a new PCR application, there is no clearly established and regularly followed rule governing when successive PCR applications raising *Atkins* claims are allowed in South Carolina. Because the PCR court relied on procedural rules that were inadequate to support the judgment, the federal courts are not barred from reviewing Bryant's FASD-based *Atkins* claim, and the case should be remanded to the district court for merits consideration.

*Second*, the District Court erred by construing the PCR court's decision as an adjudication on the merits under AEDPA. The district court correctly observed that the PCR court's refusal to hear Bryant's FASD-based *Atkins* claim was based in part on federal law, and that procedural default

21

therefore does not foreclose federal review. But a judgment on a materially incomplete record is not an adjudication on the merits for purposes of AEDPA. The PCR court—having issued what it considered to be a procedural ruling barring Bryant's amendment—refused to allow Bryant to fully develop the facts about his FASD or its functional equivalence with intellectual disability. The district court therefore erred by construing the PCR court's decision as a merits ruling deserving AEDPA deference.

*Third*, the district court erred by failing to recognize that, even construed as an adjudication on the merits, the PCR court's decision violates clearly established Supreme Court precedent. The Supreme Court has clearly established that courts must consult current medical standards when deciding whose execution violates the Eighth and Fourteenth Amendments under the *Atkins* line of cases. The district court mistakenly concluded that the PCR court considered and rejected the expert testimony Bryant presented about the functional equivalence between his FASD and intellectual disability. But the record reveals that the PCR court presumed that Bryant's brain damage does not render him ineligible for execution without considering the current medical understanding that, in cases like Bryant's, FASD is indistinguishable from intellectual disability. Because the

22

PCR decision violated clearly established Supreme Court precedent, Bryant is allowed to seek relief in the federal courts.

The remedy for any one of these errors is a remand for the district court to consider Bryant's claim unconstrained by AEDPA's limitations on relief.

## STANDARD OF REVIEW

This Court reviews *de novo* the district court's grant of summary judgment in habeas proceedings. *Frye v. Lee*, 235 F.3d 897, 902 (4th Cir. 2000).

## ARGUMENT

I.    **The federal courts can consider the merits of Bryant's claim because the procedural rules the state court relied upon to bar relief were inadequate to support the judgment.**

A federal court sitting in habeas may decline to address the merits of a claim that was defaulted in state-court proceedings. *See House v. Bell*, 547 U.S. 518, 522 (2006) ("Out of respect for the finality of state-court judgments federal habeas courts, as a general rule, are closed to claims that state courts would consider defaulted.") But a state court's reliance on a procedural rule when denying relief does not end the inquiry. To constitute a procedural bar in federal court, the state court's ruling must be (a) based

23

on an "adequate" state procedural rule, and (b) "independent" of the merits of the federal claim. *See Coleman v. Thompson*, 501 U.S. 722, 729-30 (1991). Because procedural default is an affirmative defense, the burden rests with the state to prove the independence and adequacy of the relied-on procedural bar. *See Jones v. Sussex I State Prison*, 591 F.3d 707, 716 (4th Cir. 2010).

To be "adequate," the relied-on rule must be "firmly established and regularly followed state practice." *James v. Kentucky*, 466 U.S. 341, 348 (1984); *see also Hathorn v. Lovorn*, 457 U.S. 255, 262-63 (1982) (observing that only a procedural rule that is "strictly or regularly followed" to bar relief to state-court litigants in the petitioner's position is adequate to support procedural default). "Adjudicating this prerequisite to the procedural default defense requires close scrutiny of the law and 'procedural practices of the States.'" 2 Randy Hertz & James S. Liebman, *Federal Habeas Corpus Practice and Procedure* 1506 n.8 (7th ed. 2015) (quoting *Lambix v. Singletary*, 520 U.S. 518, 525 (1997)).

Close scrutiny of the law and procedural practices of South Carolina reveals no firmly established or regularly followed rule that barred Bryant from amending his PCR application to develop his FASD-based *Atkins* claim. Instead, the PCR court relied on the statute of limitations on PCR

24

actions, S.C. Code Ann. § 17-27-45, and the prohibition against successive PCR actions, S.C. Code Ann. § 17-27-90. For two reasons, however, these procedural rules did not clearly prohibit Bryant's amendment of his second PCR application.

A. **Procedural default does not apply because there is no clear rule governing the amendment of a successive PCR application.**

First, procedural default does not apply because South Carolina has no clear rule governing the amendment of a pending successive PCR application. After all, Bryant did not seek to file a new PCR application raising the FASD issue; rather, he sought leave to amend the existing PCR application to reflect expert conclusions that his deficits stemmed from FASD and impaired him equally to intellectual disability. JA518, JA521-522.

As a general rule, amendments to PCR applications are liberally allowed. S.C. Code Ann. § 17-27-70 ("At any time prior to entry of judgment the court may, when appropriate, issue orders for amendment of the application . . . ."). In fact, while "Rule 15 of the South Carolina Rules of Civil Procedure provides for a liberal approach to the granting of amendments to pleadings," "the reality is that this Court has gone even further in post-conviction relief (PCR) matters due to the practical realities

25

of PCR litigation." *Love v. State*, 834 S.E.2d 196, 202 (S.C. 2019)
(Kittredge, J., dissenting). The South Carolina Supreme Court has held that
a PCR court erred when it refused to allow a petitioner to amend his
application on the morning of a PCR hearing. *See id.* at 202 (majority
opinion). The court has likewise held that a PCR court erred when, after a
PCR hearing, it refused to allow a petitioner to amend his application to
add a claim that was presented for the first time at the hearing. *See
Simpson v. Moore*, 627 S.E.2d 701, 707-08 (S.C. 2006). But no statute,
court rule, or Supreme Court opinion specifically addresses amendments to
successive PCR applications. Against this backdrop, there is no clearly
established rule that, while an initial PCR application may be freely
amended, a second PCR application may not.

This Court's ruling in *Thomas v. Davis*, 192 F.3d 445 (4th Cir. 1999),
illustrates that procedural default cannot rest on so nebulous a rule. In that
case, the state asserted that Thomas's federal constitutional claim was
procedurally defaulted because the Supreme Court of South Carolina
declined to consider it on the grounds that it had not been properly
preserved. *Id.* at 450. Examining South Carolina's rules of procedure and
the relevant case law, this Court discovered an "uncertain state of affairs in
South Carolina" as to whether a litigant in Thomas's position would be

deemed to have abandoned the claim at issue. *Id.* at 452. This Court concluded, therefore, that even assuming such a procedural rule existed, "a rule sought to be applied for the first time cannot have been consistently or regularly applied in the past," and was therefore inadequate to support the judgment. *Id.* at 452-53. The same is true here: Like the preservation rule in *Thomas*, any rule "ostensibly applied" to prohibit the amendment of successive PCR applications "eludes ready identification, at least as applied to the facts of this case." *Id.* at 453, 450-51. No such rule can foreclose merits review in federal court.

### B.    Procedural default does not apply because there is no clear rule barring successive PCR applications raising ineligibility for execution.

In the absence of clear rules governing the amendment of successive PCR applications, the court treated Bryant's request to amend his second PCR application as a request to file a subsequent PCR. The law and procedural practices of South Carolina reveal that there is no "strictly or regularly followed" South Carolina rule that forbids a successive PCR application asserting a petitioner's ineligibility for execution. *Hathorn*, 457 U.S. at 263 (quoting *Barr v. City of Columbia*, 378 U.S. 146, 149 (1964)). There is a general rule against successive PCR applications: "All grounds for relief available to an applicant under this chapter must be raised in his

original, supplemental or amended application." S.C. Code Ann. § 17-27-90. But this bar on successive applications does not apply "if the court finds a ground for relief asserted which for sufficient reason was not asserted or was inadequately raised in the original, supplemental or amended application." *Id.* Importantly here, the state courts sometimes apply this exception to allow a successive and otherwise untimely PCR application asserting that a petitioner's execution is unconstitutional under the *Atkins* line of cases.

Bryant's own PCR process demonstrates that there exists no strictly or regularly followed rule barring successive PCR applications that assert a petitioner's ineligibility for execution. When Bryant filed his second PCR application claiming intellectual disability, he also filed a third application raising different claims. JA99-107, JA429-435. The state argued that both applications should be summarily dismissed as untimely and improperly successive. JA108-121, JA438-451. Applying S.C. Code Ann. §§ 17-27-45 and 90, the PCR court distinguished between the two sets of claims: While dismissing the third application as untimely and improperly successive, JA122-135, it found it "appropriate for the post-conviction court to address [Bryant's] *Atkins* claim." JA812. In doing so, it observed that "holding that an *Atkins* claim is subject to procedural default would result in an

28

unnecessary waste of judicial time and resources and, based on a [sic] incorrectly applied technicality, the wrongful execution of someone who is Constitutionally ineligible for the death penalty." JA812. That decision shows that, at least sometimes, South Carolina courts hear untimely and successive claims that a petitioner is constitutionally ineligible for execution.

While South Carolina courts have applied this exception on multiple occasions,[6] the procedural rules regarding successive PCR applications raising *Atkins* claims are far from "firmly established." *James*, 466 U.S. at 348. The state's position on Bryant's second PCR application illustrates this point. When the PCR court allowed Bryant's *Atkins* claim to proceed, the Supreme Court of South Carolina had never addressed the question. The state petitioned for a writ of certiorari on the issue, arguing that the PCR court erred in holding that Bryant's *Atkins* claim fell under the exception to the statute of limitations and bar on successive applications. JA849-867. Even though the claim had already been dismissed, the state urged the supreme court to "address the failure to apply the well-established

---

[6] *See, e.g.*, JA811-812 & n.8 (taking judicial notice of *Edward Lee Elmore v. State*, Greenwood County Case Number 2005-CP-24-1205, in which Elmore was allowed to adjudicate the issue of intellectual disability in a successive PCR action; *Woods v. State*, No. 2019-001713, 2019 WL 6898088, at *1 (S.C. Dec. 18, 2019) (per curiam) (discussed *infra*).

procedural bars in order to guide the lower court in the proper consideration of similar cases." JA865. The state's request for the supreme court's guidance shows that the law at the time was unsettled. The court denied the state's petition, JA868, leaving obscure the rules governing successive PCR applications raising ineligibility for execution.

A subsequent state supreme court decision demonstrates the possibility that Bryant's FASD-based *Atkins* claim falls under the exception to S.C. Code Ann. §§ 17-27-45 and 90. In *Woods v. State*, the South Carolina Supreme Court reviewed a lower state-court order dismissing as untimely and successive a PCR application raising an *Atkins* claim. *Woods v. State*, No. 2019-001713, 2019 WL 6898088, at *1 (S.C. Dec. 18, 2019) (per curiam). The court reversed: "Because there is a possibility the Constitution categorically bars Petitioner's execution, we hold the successive PCR application in this case is permissible because of extraordinary circumstances." *Id.*[7] As in *Woods*, Bryant's amended PCR application would have raised the "possibility that the Constitution categorically bars his execution" because of his FASD. *Id.* Together with the

---

[7] The district court recognized that this opinion, though non-precedential, "likely signals South Carolina'[s] acceptance that *Atkins* created one of the few exceptions in which successive applications will be allowed." JA1159 n.2.

30

procedural history of his own case, the *Woods* decision demonstrates that there was no clearly established, regularly followed rule barring Bryant from pursuing his FASD-based *Atkins* claim in a successive PCR application.

Importantly, Bryant need not show that state rules allowed him to press his FASD-based *Atkins* claim. To invoke procedural default, the state bears the burden of proving that a "firmly established and regularly followed" rule foreclosed state-court relief. *James*, 466 U.S. at 348; *Jones*, 591 F.3d at 716. Since South Carolina courts regularly hear successive PCR applications raising a petitioner's ineligibility for execution, the rules relied upon to foreclose Bryant's FASD-based *Atkins* claim were neither clearly established nor regularly applied, and were therefore inadequate to support procedural default. The federal courts can and should address the merits of Bryant's claim *de novo*. *See Bostick v. Stevenson*, 589 F.3d 160, 163 (4th Cir. 2009) ("[W]here the state courts did not reach the claim's merits and instead ruled on procedural grounds, we review the claim de novo."). His case should be remanded for the district court to do just that.

31

## II.  The state court's refusal to allow Bryant's amendment was not an adjudication on the merits.

While failing to recognize the inadequacy of the state-court procedural rule invoked to bar Bryant's proposed amendment, the district court nevertheless held that doctrine of procedural default does not bar federal habeas relief. JA1155-1160. The district court observed that, in refusing to allow the amendment, the PCR court necessarily decided that intellectual disability only, and not functionally equivalent conditions, exempt a petitioner from execution under the Eighth and Fourteenth Amendments. JA1157-1159 & n.2. Because the PCR court's decision "depends on a federal constitutional ruling," *Foster v. Chatman*, 578 U.S. 488, 497 (2016) (quoting *Ake v. Oklahoma*, 470 U.S. 68, 75 (1985)), it was not independent of federal law and cannot serve to foreclose federal habeas relief. JA1158-1159 & n.2.[8] The district court went on to construe the decision as an "adjudication on the merits" under AEDPA and apply the deferential standard in 28 U.S.C. 2254(d). JA1159-1160.

While correct that the PCR court's decision depended on federal law and therefore does not foreclose federal habeas review, the district court

---

[8] As the district court noted, JA1157-1159 & n.2, the Fifth Circuit has recognized that a determination like the PCR court's depends on federal law. *See Busby v. Davis*, 925 F.3d 699, 706-07 (5th Cir. 2019).

erred when it considered the PCR court's decision an adjudication on the merits under AEDPA.

Under AEDPA, federal courts "review a state court's resolution of any claims it 'adjudicated on the merits' deferentially," *Richardson v. Kornegay*, 3 F.4th 687, 695 (4th Cir. 2021), granting relief only if the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law," or was "based on an unreasonable determination of the facts in light of the evidence presented," 28 U.S.C. § 2254(d)(1) and (2). By contrast, "when a state court does not adjudicate a claim on the merits, AEDPA deference is inappropriate and a federal court must review the claim de novo." *Winston v. Pearson*, 683 F.3d 489, 496 (4th Cir. 2012) [*Winston II*]. Whether the PCR court adjudicated Bryant's claim on the merits is a legal question this Court decides *de novo. See Valentino v. Clarke*, 972 F.3d 560, 576 (4th Cir. 2020).

This Court's precedents establish that "judgment on a materially incomplete record is not an adjudication on the merits for purposes of § 2254(d)." *Winston v. Kelly*, 592 F.3d 535, 555-56 (4th Cir. 2010) [*Winston I*]. A record is materially incomplete "when a state court unreasonably refuses to permit 'further development of the facts' of a

33

claim." *Winston II*, 683 F.3d at 496 (quoting *Winston I*, 592 F.3d at 555). In Bryant's case, the PCR court did just that.

Because it concluded that Bryant's proposed amendment was time-barred and improperly successive, the PCR court explicitly refused to hear Bryant's proposed evidence on his FASD and its functional equivalence with intellectual disability. JA381. Instead, it limited the scope of the evidentiary hearing to allow only testimony it considered relevant to a diagnosis of intellectual disability. JA380-381, JA387. As the state observed, "the PCR court did not allow the litigation of [the FASD] allegation, or even make a finding on whether the condition actually existed." JA1183. The PCR court's denial of Bryant's motion to amend led to, in the words of the state, "Petitioner's inability to litigate the condition for a relevant fact-finding." JA1183.

This Court's opinion in *Gordon v. Braxton*, 780 F.3d 196 (4th Cir. 2015), establishes that the PCR court did not adjudicate Bryant's claim on the merits. In that case, Gordon sought state habeas relief on the grounds that his trial attorney failed to file an appeal when asked to do so. *Id.* at 199. The attorney denied that Gordon made the request. *Id.* The state court dismissed Gordon's petition without an evidentiary hearing. *Id.* at 199-200. The federal district court applied the deferential standards in 28 U.S.C.

34

§ 2254(d), but this Court reversed. *Id.* at 202-04. It explained that the state court, rather than solve the factual dispute at an evidentiary hearing, "focused on one line in Gordon's affidavit, while ignoring Gordon's allegations in his papers that he asked [the attorney] to file an appeal." *Id.* at 203. This Court concluded, therefore, that the state court did not adjudicate Gordon's claim on the merits for AEDPA purposes, and the district court owed no deference to the state court's decision. *Id.* at 204.

In Bryant's case, as in *Gordon*, the PCR claim turned on a factual dispute: whether, as a matter of science, Bryant's FASD is functionally equivalent to intellectual disability. The state court declined to adjudicate that factual dispute, concluding that—because it had denied Bryant's proposed amendment— "[t]he diagnosis of FASD is not critical to this litigation." JA411 n.8.

As this Court has explained, when a state court unreasonably refuses to permit full factual development, federal courts "do not offend the principles of 'comity, finality, and federalism' that animate AEDPA deference because the state court has 'passed on the opportunity to adjudicate [the] claim on a complete record.'" *Gordon*, 780 F.3d at 202 (quoting *Winston I*, 592 F.3d at 555, 557). Here, the PCR court—intending to foreclose Bryant's claim on procedural grounds—"passed on the

35

opportunity" to develop a complete record and adjudicate Bryant's claim on the merits. It is therefore owed no AEDPA deference, and this Court should remand for *de novo* consideration of Bryant's Eighth Amendment claim.

### III. Construed as a merits ruling, the state-court decision violated clearly established law by refusing to consider current medical standards to determine whether Bryant's FASD renders him constitutionally ineligible for execution.

If this Court were to construe the state court's denial of leave to amend Bryant's PCR application as a merits determination, habeas relief is still available if the state-court adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). A state court ruling is "contrary to" clearly established federal law where it "arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 413 (2000). Likewise, a state-court decision involves an unreasonable application of law when it "unreasonably refuses to extend [a legal] principle to a new context where it should apply." *Id.* at 407; *see also McNeill v. Polk*, 476 F.3d 206, 210-11 (4th Cir. 2007).

36

In this instance, that law is *Hall* and *Moore*, which clearly established that, in determining who is exempt from execution under the Eighth and Fourteenth Amendments, courts must consult current medical standards. *Hall*, 572 U.S. at 721; *Moore v. Texas*, 581 U.S. 1, 20-21 (2017).

A.    **Supreme Court precedent clearly establishes that courts must consult current medical standards when determining who is exempt from execution under the Eighth Amendment.**

In *Atkins*, the Supreme Court held that the Eighth and Fourteenth Amendments prohibit the execution of an intellectually disabled person. *Atkins*, 536 U.S. at 321. The Court reasoned that, "by definition," people with intellectual disability "have diminished capacities to understand and process information, to communicate, to abstract from mistakes and learn from experience, to engage in logical reasoning, to control impulses, and to understand the reactions of others," and these deficiencies "diminish their personal culpability." *Id.* at 318. As a result, "there is a serious question as to whether either justification . . . for the death penalty"—retribution and deterrence—applies. *Id.* at 318-19. Executing the intellectually disabled is therefore "'nothing more than the purposeless and needless imposition of

pain and suffering,' and hence an unconstitutional punishment." *Id.* at 319 (quoting *Enmund v. Florida*, 458 U.S. 782, 798 (1982)).[9]

Rather than define the bounds of the exemption, the *Atkins* Court left "to the States the task of developing appropriate ways to enforce the constitutional restriction." *Id.* at 317 (quoting *Ford v. Wainwright*, 477 U.S. 399, 416–17 (1986)). But later precedent made clear that states do not have unfettered discretion in implementing the *Atkins* ruling. In *Hall*, the Supreme Court held that—while "distinct from a medical diagnosis"—the legal determination of eligibility from execution must be "informed by the medical community's diagnostic framework." *Hall*, 572 U.S. at 721. Three years later, the Supreme Court reiterated *Hall's* holding that, in considering an intellectual disability determination, courts must observe "prevailing clinical standards." *Moore*, 581 U.S. at 15. Importantly, "the medical standards used to assess that disability constantly evolve as the scientific community's understanding grows." *Bourgeois v. Watson*, 141 S. Ct. 507, 508-09 (2020) (Sotomayor, J., dissenting from denial of certiorari) (citing *Moore*, 581 U.S. at 20).

---

[9] Three years after deciding *Atkins*, the Supreme Court recognized that youth, in addition to intellectual disability, undermines both justifications of the death penalty, and held that juvenile offenders are ineligible for execution under the Eighth Amendment. *See Roper v. Simmons*, 543 U.S. 551, 571–72 (2005).

This Court has recognized that *Moore's* imperative to consider prevailing clinical standards applies to claims not only of intellectual disability, but also FASD. *See Williams v. Stirling*, 914 F.3d 302, 317 (4th Cir. 2019) (holding that a PCR court erred by disregarding medical standards regarding fetal alcohol syndrome).

### B.    The district court erred when it concluded that the PCR court considered the medical and scientific evidence regarding Bryant's FASD.

In reviewing the PCR court's handling of Bryant's FASD-based *Atkins* claim, the district court mistakenly concluded that the PCR court considered and rejected the expert testimony Bryant presented about the functional equivalence between his FASD and intellectual disability. *See* JA1160 ("[T]he PCR court found that there was no clinical support for setting aside Bryant's testing results in favor of finding that FASD constitutes the functional equivalent of an intellectual disability.") (citing JA416). The record reveals that the PCR court made no such finding.

In the hearing on Bryant's motion to amend his application, PCR counsel cited expert opinions that—according to the current medical evidence—Bryant's FASD causes deficits commensurate with intellectual disability, and that the standard of care would require treating Bryant identically as someone with an intellectual disability. JA578-580.

39

Nevertheless, in denying Bryant's motion to amend his application to include FASD, the PCR Court insisted that the "only issue before the Court will remain whether Applicant is intellectually disabled (*i.e.*, mentally retarded) according to the definition applicable to these proceedings." JA385. For the applicable definition, the court cited the South Carolina Code and South Carolina Supreme Court cases regarding intellectual disability. JA385. It did not engage with the evidence that the current medical consensus rejects those definitions when applied to an FASD sufferer like Bryant.

Even after a hearing in which Bryant's experts proffered testimony about the functional equivalence between the two conditions, the PCR court still refused to consider that evidence. When, after the hearing, Bryant again moved to amend his petition to include FASD, the PCR court deemed irrelevant Bryant's FASD and its equivalence with intellectual disability:

> While Applicant may suffer from some form of FASD or associated condition, and may have an impaired brain, this Court does not believe Applicant met his burden of proof that he possesses an intellectual disability consistent with the specific condition at issue. It is only that condition that is the basis of this litigation and only that condition that needs to be proven.

JA416. The PCR court never examined, weighed, or evaluated the current medical standards equating Bryant's FASD and intellectual disability.

40

Instead, it discounted Dr. Woods's expertise precisely because he attempted to testify to that fact, commenting that "Dr. Woods' opinion is clouded by a push to accept a 'functional equivalent' of Intellectual Disability in another condition." JA416. The PCR court did not, in the words of the district court, "find no clinical support . . . for [the] finding that FASD constitutes the functional equivalent of an intellectual disability." JA1160. Rather, it assumed that no such equivalence exists and ignored evidence to the contrary.

C.    The PCR court violated clearly established law by refusing to consider the scientific evidence that Bryant's FASD is functionally equivalent to an intellectual disability.

As discussed above, the *Atkins* and *Roper* decisions recognize that neither justification of the death penalty—retribution and deterrence of capital crimes—applies to juveniles or the intellectually disabled. *Atkins* 536 U.S. at 318-20; *Roper*, 543 U.S. at 571-72. At the PCR hearing, Drs. Woods and Everington offered evidence that the same is true for people suffering from FASD, but the PCR court refused to consider it, in violation of clearly established law.

As for retribution, the Supreme Court has held that, due to their diminished capacities, both intellectually disabled people and juveniles have reduced personal culpability. *See Atkins*, 536 U.S. at 319; *Roper*, 543

41

U.S. at 571. According to the testimony offered by Bryant's experts, Bryant too has "diminished capacities to understand and process information, to communicate, to abstract from mistakes and learn from experience, to engage in logical reasoning, to control impulses, and to understand others' reactions." *Atkins* 536 U.S. at 305; *see* JA516, JA531, JA533. Bryant's FASD therefore undermines the retribution rationale by reducing his personal culpability. *See Roper*, 543 U.S. at 571 ("Retribution is not proportional if the law's most severe penalty is imposed on one whose culpability or blameworthiness is diminished, to a substantial degree . . . .").

The PCR court also ignored medical evidence showing that FASD undermines the deterrence rationale of the death penalty. As the *Atkins* Court observed, "[t]he theory of deterrence in capital sentencing is predicated upon the notion that the increased severity of the punishment will inhibit criminal actors from carrying out murderous conduct." *Atkins*, 536 U.S. at 320. According to Bryant's experts, like youth and intellectual disability, FASD harms Bryant's ability to process the possibility of execution and to control his impulses because of that possibility. *See Atkins*, 536 U.S. at 320; *Roper*, 543 U.S. at 571-72; JA536-537, JA752-753, JA756-757. FASD thereby erodes the deterrence theory of capital punishment.

42

A close look at the Supreme Court's holding in *Hall* reveals that the PCR court violated clearly established law by ignoring the evidence that Bryant's FASD diminishes his culpability identically to youth and intellectual disability. In *Hall*, the Supreme Court overturned as inconsistent with *Atkins* a Florida law that foreclosed all further exploration of intellectual disability if a petitioner scored above 70 on an IQ test. *Hall*, 572 U.S. at 704. The Court found that Florida's rule disregarded established medical practice in two ways: (1) It took "an IQ score as final and conclusive evidence of a defendant's intellectual capacity, when experts would consider other evidence"; and (2) "it relie[d] on a purportedly scientific measurement of a defendant's abilities, while refusing to recognize that measurement's inherent imprecision." *Hall*, 572 U.S. at 712. The PCR court's refusal to consider other evidence of Bryant's deficits does the same thing: It takes Bryant's IQ score "as final and conclusive evidence" of his eligibility for execution under the Eighth Amendment, disregarding the medical understanding that the deficits caused by FASD should be measured in other ways. *Id.* And it "relies on a purportedly scientific measurement of a defendant's abilities, while refusing to recognize" that IQ is a poor measure of the deficits caused by FASD. *Id.*

The PCR court's decision therefore defies *Hall's* precise holding that "it is proper to consider the psychiatric and professional studies that elaborate on the purpose and meaning of IQ scores to determine how the scores relate to the holding of *Atkins*." *Hall*, 572 U.S. at 709-10. Those studies establish that, for someone with Bryant's condition, relying on IQ scores undermines the holding of *Atkins* by underestimating a defendant's deficits and thus inflating his culpability. By ignoring this evidence, the PCR court's decision violates clearly established constitutional law.

In short, had the PCR court reviewed the medical standards presented by Bryant's experts, it would have discovered that executing Bryant would defy the practical, legal, and moral reasoning of *Atkins* and *Roper*. By failing to consider the current medical understanding that, in a case like Bryant's, FASD is the functional equivalent of intellectual disability, the PCR court violated clearly established Supreme Court precedent.

## CONCLUSION

This Court should vacate the judgment of the district court and remand for merits review.

## REQUEST FOR ORAL ARGUMENT

Because of the importance and complexity of the issues presented in this appeal, Bryant respectfully requests that the Court hear oral argument.

44

Respectfully submitted April 3, 2024,

John G. Baker
Federal Public Defender for the
Western District of North Carolina

*s/ Gretchen L. Swift*
Gretchen L. Swift
Laura K. McCready
Assistant Federal Public Defenders
FEDERAL PUBLIC DEFENDER
FOR THE WESTERN DISTRICT
OF NORTH CAROLINA
129 West Trade Street, Suite 300
Charlotte, NC 28202
704-374-0720
gretchen_swift@fd.org
Laura_McCready@fd.org

*s/ E. Charles Grose, Jr.*
E. Charles Grose, Jr.
GROSE LAW FIRM, LLC
305 Main Street
Greenwood, SC 29646
864-538-4466
charles@groselawfirm.com

Counsel for Appellant

## CERTIFICATE OF COMPLIANCE

1.    The foregoing brief has been prepared in a proportionally spaced typeface using Microsoft Word, Georgia, 14 point.

2.    Exclusive of the table of contents; table of citations; certificate of compliance and the certificate of service, the foregoing brief contains 8,887 words.

3.    I understand that a material misrepresentation can result in the Court striking the brief and imposing sanctions.  If the Court so directs, I will provide an electronic version of the brief with the word or line printout.


                                    *s/ Gretchen L. Swift*
                                    Gretchen L. Swift