In the

# UNITED STATES COURT OF APPEALS
### FOR THE FOURTH CIRCUIT

## STEPHEN COREY BRYANT,

*Petitioner-Appellant,*

v.

## BRYAN P. STIRLING, Commissioner, South Carolina Department of Corrections & LYDELL CHESTNUT, Deputy Warden, Broad River Road Correctional Facility

*Defendants-Appellees,*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

BRIEF OF FASD UNITED AS *AMICUS CURIAE* IN SUPPORT
OF PETITIONER-APPELLANT

JOHN R. MILLS
NATHALIE GREENFIELD
PHILLIPS BLACK, INC.
1721 Broadway, Suite 201
Oakland, CA 94612
888-532-0897
j.mills@phillipsblack.org

*Counsel for* Amicus Curiae

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................. iii

INTEREST OF AMICUS CURIAE ..................................................................... 1

SUMMARY OF ARGUMENT .............................................................................. 2

ARGUMENT ........................................................................................................ 3

I.   CURRENT MEDICAL STANDARDS ESTABLISH THAT FASD IS AN ID-EQUIVALENT NEURODEVELOPMENTAL DISORDER THAT CAN RESULT IN COMMENSURATE DEFICITS TO INTELLECTUAL DISABILITY ................................................................................................. 3

   A.   States Must Account for Current Medical Consensus When Determining Who They Exempt From Execution .................................................................. 3

   B.   Current Medical Consensus Does Not Meaningfully Differentiate Between Those With Intellectual Disability and Those with FASD .................................. 4

   C.   In Line With Current Medical Consensus, States Must Recognize That FASD is Functionally Equivalent to Intellectual Disability .............................. 10

II.  THE DISTRICT COURT FAILED TO CONSIDER THE CURRENT MEDICAL CONSENSUS THAT FASD IS FUNCTIONALLY EQUIVALENT TO INTELLECTUAL DISABILITY .................................................................. 11

III. MR. BRYANT'S FASD DIAGNOSIS MUST EXEMPT HIM FROM EXECUTION ...................................................................................................... 11

   A.   Mr. Bryant Has FASD, an ID-Equivalent Disorder .................................. 11

   B.  Executing Mr. Bryant Would Defy the Penological Justifications Underpinning the Use of the Death Penalty .................................................... 14

CONCLUSION ..................................................................................................... 15

# TABLE OF AUTHORITIES

**Cases**

*Atkins v. Virginia*,
  536 U.S. 305 (2002) ........................................................................ 7

*Ford v. Wainwright*,
  477 U.S. 399 (1986) ........................................................................ 8

*Hall v. Florida*,
  572 U.S. 701 (2014) ........................................................................ 8

*Moore v.* Texas,
  581 U.S. 1 (2017) ........................................................................... 8

**Other Authorities**

AAMR, Mental Retardation: Definition, Classification, and Systems of
  Support (9th ed. 1992) .................................................................... 8

Amy M. Schonfeld, et al., *Executive Functioning Predicts Social Skills
  Following Prenatal Alcohol Exposure*, 12 Child Neuropsy. 439 (2006)............. 12

Anastasia Hronis, et al., *A Review of Cognitive Impairments in Children with
  Intellectual Disability: Implications for Cognitive Behvioural Therapy*, 56
  British J. Clin. Psy. 189 (2017)........................................................... 14

APA, *Diagnostic and Statistical Manual of Mental Disorders* (5th ed., text rev.)
  (2022)........................................................................................ 12, 14

APA, *Diagnostic and Statistical Manual of Mental Disorders* 41 (4th ed. 2000).... 8

Ashley L. Ware, et al., *Executive Function Predicts Adaptive Behavior in
  Children with Histories of Heavy Prenatal Alcohol Exposure and Attention
  Deficit/Hyperactivity Disorder*, 36 Alcoholism: Clinical & Experimental Res.
  1431 (2012)................................................................................... 12

Camila Sabat, et al., *Different Abilities Needed at Home and School: The
  Relation Between Executive Function and Adaptive Behavior in Adolescents
  with Down Syndrome*, 10 Sci. Rep. 1683 (2020)................................. 11

Daniel Flack et al., *Following Up After* Moore *and* Hall*: A National Survey of State Legislation Defining Intellectual Disability*, 28 Psy. Pub. Pol'y & L 459 (2022)............................................................................................... 10

George W. Woods & Stephen Greenspan, *Intellectual Disability as a Disorder of Reasoning and Judgment: The Move Away from Intelligence Quotient Ceilings*, 27 Current Op. in Psy. 110 (2014)................................................. 10, 16

H. Carmichael Olson, et al., *Neuropsychological Deficits in Adolescents with Fetal Alcohol Syndrome; Clinical Findings*, 22 Alcoholism: Clinical and Experimental Res. 8 (1998) ................................................................... 14

James C. Harris & Stephen Greenspan, *Definition and Nature of Intellectual Disability* in Nirbary N. Singh, Handbook of Evidence Based Practices in Intellectual and Developmental Disabilities (2016) ........................................... 10

K. Wyper & J. Pei, *Neurocognitive Difficulties Underlying High Risk and Criminal Behaviour in FASD: Clinical Implications* in Monty Nelson & Marguerite Trussler (eds.), Fetal Alcohol Spectrum Disorders in Adults: Ethical and Legal Perspectives (2016) .................................................... 14

Lisa Christensen & Bruce L. Baker, *Risk-taking and Delinquent Behaviors Among Youth with and Without Intellectual Disabilities*, 13 J. Mental Health & Res. in Intellectual Disabilities 1 (2020) ......................................... 15

Lorcan Cribb, et al., *Childhood Executive Function Predicts Later Autistic Feature and Adaptive Behavior in Young Autistic People: A 12-Year Prospective Study*, 47 J. Abnormal Child Psy. 1089 (2018)............................... 11

Marc J. Tassé & Minje Kim, *Examining the Relationship Between Adaptive Behavior and Intelligence*, 13 Behav. Sci. 252 (2023) ........................................ 11

Marc J. Tassé, *Adaptive Behavior and the Diagnosis of Mental Retardation*, 16 Applied Neuropsy. 114 (2009)............................................................................. 11

Nancy Haydt et al., *Advantages of DSM-5 in the Diagnosis of Intellectual Disability: Reduced Reliance on IQ Ceilings* in Atkins *(Death Penalty) Cases*, 82 UKMC L. Rev. 359 (2014) .................................................... 10, 12, 13

Natalie Novick Brown & C.R. Reynolds, *Connecting the Dots: Functional Behavior Evaluation* in Natalie Novick Brown (ed.) Evaluating Fetal Alcohol Spectrum Disorders (FASD) in the Forensic Context (2021).............................. 14

Natalie Novick Brown & Stephen Greenspan, *Diagnosing Intellectual Disability in People with FASD: A Function of Which Diagnostic Manual is Used?* 40 Behav. Sci. & L. 31 (2021).................................................................. 13

Natalie Novick Brown & Stephen Greenspan, *Diminished Culpability in Fetal Alcohol Spectrum Disorders*, 39 Behav. Sci. & L. 1 (2021)................................ 14

Natalie Novick Brown, et al., *A proposed Model Standard for Forensic Assessment of FASD*, 38 J. Psy. & L. 383 (2010) ................................................. 13

Natalie Novick Brown, et al., *Prenatal Alcohol Exposure: An Assessment Strategy for the Legal Context*, 42 Int'l J. L. & Mental Health 144 (2015)........ 13

Natalie Novick Brown, *Fetal Alcohol Spectrum Disorders (FASD): Intellectual Disability Equivalence* in Monty Nelson & Marguerite Trussler (eds.), Fetal Alcohol Spectrum Disorders in Adults: Ethical and Legal Perspectives (2016) ................................................................................................................. 15

Sissel Gravrakmo, et al., *Associations Between Executive Functions, Intelligence and Adaptive Behaviour in Children and Adolescents with Mild Intellectual Disability*, J. Intellectual Disabilities (2022).................................... 12

Stephen Greenspan et al., *FASD and the Concept of "Intellectual Disability Equivalence"*, in Monty Nelson & Marguerite Trussler (eds.), Fetal Alcohol Spectrum Disorders in Adults: Ethical and Legal Perspectives 264–48 (2016) ......................................................................................................... 12, 13, 15

Stephen Greenspan, et al., *Determining Disability Severity Level for Fetal Alcohol Spectrum Disorder: Assessing the Extent of Impairment* in Natalie Novick Brown (ed.), Evaluating Fetal Alcohol Spectrum Disorders (FASD) in the Forensic Context (2021) ......................................................................... 15

Stephen Greenspan, James C.O. Harris, & George Woods, *Intellectual Disability Is "A Condition, Not a Number": Ethics of IQ Cut-offs in Psychiatry, Human Service, and Law*, 1 Ethics, Med. & Pub. Health 312 (2015)................................................................................................................ 13

Timothy E. Moore & M. Green, *Fetal Alcohol Spectrum Disorder (FASD): A Need For Closer Examination by the Criminal Justice System*, 19 Crim Reports 99 (2004) .............................................................................. 10

## INTEREST OF AMICUS CURIAE[1]

*Amicus*, FASD United, is a national, non-profit, public health advocacy group committed to raising awareness of the risks associated with alcohol consumption during pregnancy. *Amicus* is a national, non-profit, public health advocacy group committed to raising awareness of the risks associated with alcohol consumption during pregnancy and supporting families living with fetal alcohol spectrum disorders. FASD United represents children and adults seeking medical, mental health, education, rehabilitative, and other therapeutic services for Fetal Alcohol Spectrum Disorder (FASD). Further, FASD United advocates for the education of law enforcement officers, correctional officers, and courts about FASD and its effects.

In the capital punishment context, FASD United advocates for courts to become familiar with medical standards recognizing that, with respect to moral culpability, FASD is a disorder without distinction from intellectual disability. In light of the evidence before this court, Petitioner Stephen Bryant exhibits the hallmark features of FASD. This case has important implications for the treatment of FASD in the capital punishment context because the central inquiry in this case

---

[1] Pursuant to Rule 29, Amicus certifies that no party or counsel for a party authored this brief in whole or in part and that no party or counsel for a party made a monetary contribution intended to fund the preparation or submission of this brief.

calls on the court to assess if the punishment at stake is consistent with current medical standards and society's evolving standards of decency.

## SUMMARY OF ARGUMENT

It is well established that courts must account for the current medical standard when determining whether a person is exempt from execution due to intellectual disability. That standard now recognizes that IQ scores are a poor benchmark by which to assess intellectual disability and that adaptive functioning provides a more realistic and accurate paradigm for assessing the real-world impact of a disorder. In light of these developments, current medical consensus is that Fetal Alcohol Spectrum Disorder (FASD)—a neurological disorder producing significant adaptive deficits—is an equivalent disorder to intellectual disability, the effects of which are best assessed by looking to a person's adaptive functioning. Current medical consensus thus means that there is no rationale for courts to differentiate between those with FASD and those with intellectual disability.

The district court failed to account for current medical standards in its decision below. Petitioner Stephen Bryant lives with FASD. Properly accounted for, Mr. Bryant's FASD diagnosis should be treated as the equivalent of intellectual disability and should, therefore, exempt him from execution. This court should vacate the summary judgment grant below and remand to the district court for proper consideration of Mr. Bryant's FASD claim.

# ARGUMENT

## I. CURRENT MEDICAL STANDARDS ESTABLISH THAT FASD IS AN ID-EQUIVALENT NEURODEVELOPMENTAL DISORDER THAT CAN RESULT IN COMMENSURATE DEFICITS TO INTELLECTUAL DISABILITY

### A. States Must Account for Current Medical Consensus When Determining Who They Exempt from Execution

The Constitution of the United States prohibits the execution of persons with intellectual disability. *See Atkins v. Virginia*, 536 U.S. 305 (2002). When the Supreme Court announced this exemption from execution, intellectual disability generally required a showing of substantially impaired intellectual functioning and limitations in adaptive functioning, with onset during the developmental period. *Id.* at 318, 303 n.3 (citing medical standards in the AAMR, Mental Retardation: Definition, Classification, and Systems of Support 5 (9th ed. 1992) and APA, *Diagnostic and Statistical Manual of Mental Disorders* 41 (4th ed. 2000)).

The Court left the development of standards for implementing this protection to the States. *Id.* at 317. Consistent with the approach outlined for other categorical exemptions to the imposition of capital punishment, and in the absence of a "national consensus" on how to assess intellectual disability in the capital punishment context, the Court charged the States with delineating the parameters of the intellectual disability inquiry. *Id.* ("As was our approach in *Ford v. Wainwright*, with regard to insanity, 'we leave to the State[s] the task of developing appropriate ways to enforce

3

the constitutional restriction upon [their] execution of sentences.' (quoting *Ford v. Wainwright*, 477 U.S. 399, 405 (1986))).

Such a "national consensus" has now emerged. Courts must apply current medical standards to assess intellectual disability disorders. *See Hall v. Florida*, 572 U.S. 701, 721 (2014) ("The legal determination of intellectual disability is . . . informed by the medical community's diagnostic framework."); *Moore v. Texas*, 581 U.S. 1, 5 (2017) ("adjudications of intellectual disability should be 'informed by the views of medical experts.'") (quoting *Hall*, 572 U.S. at 721). Current medical standards must inform courts' assessment of both intellectual functioning, *see Hall*, 572 U.S. at 724, and adaptive functioning, *see Moore*, 581 U.S. at 5–6. Accounting for the current medical understanding of developmental disabilities is, thus, required to avoid unconstitutionally executing a person who is categorically exempt from the death penalty.

## B. Current Medical Consensus Does Not Meaningfully Differentiate Between Those with Intellectual Disability and Those with FASD

Recent advancements in the medical community's understanding of intellectual disability disorders and fetal alcohol spectrum disorders have led experts towards a clinical model that focuses on adaptive deficits. *See generally* James C. Harris & Stephen Greenspan, *Definition and Nature of Intellectual Disability* in Nirbary N. Singh, Handbook of Evidence Based Practices in Intellectual and Developmental Disabilities (2016); Daniel Flack et al., *Following Up After* Moore

*and* Hall*: A National Survey of State Legislation Defining Intellectual Disability*, 28 Psy., Pub. Pol'y & L 459 (2022); George W. Woods & Stephen Greenspan, *Intellectual Disability as a Disorder of Reasoning and Judgment: The Move Away from Intelligence Quotient Ceilings*, 27 Current Op. in Psy. 110 (2014); Timothy E. Moore & M. Green, *Fetal Alcohol Spectrum Disorder (FASD): A Need For Closer Examination by the Criminal Justice System*, 19 Crim Reports 99 (2004). These advancements have rendered IQ testing inaccurate and inadequate as a means of determining who falls under the umbrella of intellectual disability and similar disorders. Nancy Haydt et al., *Advantages of DSM-5 in the Diagnosis of Intellectual Disability: Reduced Reliance on IQ Ceilings in* Atkins *(Death Penalty) Cases*, 82 UKMC L. Rev. 359, 366–70 (2014).

Indeed, over the last decade, the medical community has increasingly warned against placing undue weight on IQ testing when assessing neurodevelopmental disorders. IQ scores provide a poor metric through which to assess such disorders because numbers-based testing does not accurately capture limitations in intellectual functioning. *See id.*; Woods & Greenspan, *supra*, at 111. Rather, the inquiry must look to adaptive deficits and executive functioning. This is so because adaptive behavior and executive functioning are oriented around real world challenges, thereby providing a more realistic paradigm for assessing the impact of a disorder. *See id.* Put differently, the medical community recognizes that IQ scores do not

answer the question of how someone functions in society, whereas deficits in adaptive functioning provide information about how well a person meets community standards of personal independence and social responsibility in comparison to others of similar age and sociocultural background. *See generally* Marc J. Tassé, *Adaptive Behavior and the Diagnosis of Mental Retardation*, 16 Applied Neuropsy. 114 (2009); Marc J. Tassé & Minje Kim, *Examining the Relationship Between Adaptive Behavior and Intelligence*, 13 Behav. Sci. 252 (2023).

In line with the move away from IQ scores, assessments of adaptive behavior and executive functioning have proved an important indicator of many neurodevelopmental disorders. FASD is one such disorder. *See* Ashley L. Ware, et al., *Executive Function Predicts Adaptive Behavior in Children with Histories of Heavy Prenatal Alcohol Exposure and Attention Deficit/Hyperactivity Disorder*, 36 Alcoholism: Clinical & Experimental Res. 1431 (2012); Amy M. Schonfeld, et al., *Executive Functioning Predicts Social Skills Following Prenatal Alcohol Exposure*, 12 Child Neuropsy. 439 (2006). Other examples of disorders that are poorly predicted using IQ scores include autism spectrum disorder, *see* Lorcan Cribb, et al., *Childhood Executive Function Predicts Later Autistic Feature and Adaptive Behavior in Young Autistic People: A 12-Year Prospective Study*, 47 J. Abnormal Child Psy. 1089 (2018), and Down syndrome, *see* Camila Sabat, et al., *Different Abilities Needed at Home and School: The Relation Between Executive Function*

*and Adaptive Behavior in Adolescents with Down Syndrome*, 10 Sci. Rep. 1683 (2020).

Focusing on adaptive deficits has also deepened the medical community's understanding of neurodevelopmental disorders beyond that which is diagnosed as "intellectual disability." Critically, medical advancements now recognize that Fetal Alcohol Spectrum Disorder (FASD) and other disorders, such as Down Syndrome and Prader-Willi Syndrome, are ID-equivalent conditions, notwithstanding IQ score. *See* Stephen Greenspan et al., *FASD and the Concept of "Intellectual Disability Equivalence"*, in Monty Nelson & Marguerite Trussler (eds.), Fetal Alcohol Spectrum Disorders in Adults: Ethical and Legal Perspectives 264–48 (2016); Haydt et al., *supra*, at 366. Indeed, the only differential diagnosis between FASD and Intellectual Disability Disorder rests upon the weakest criteria, and the criteria least able to illuminate how a person functions in society: IQ scores. APA, *Diagnostic and Statistical Manual of Mental Disorders* (5th ed., text rev.) (2022); *see* Natalie Novick Brown & Stephen Greenspan, *Diagnosing Intellectual Disability in People with FASD: A Function of Which Diagnostic Manual is Used?* 40 Behav. Sci. & L. 31, 42–43 (2021). It is for these reasons that legislatures around the country recognize that disorders such as FASD are the functional equivalent of intellectual disability when determining eligibility for ID-related benefits and services. Greenspan et al., *supra*, at 246–48; Haydt et al., *supra*, at 366. Accounting for these advancements,

an IQ score of around 70 is no longer required for a person to be exempt from execution. Brown & Greenspan, *supra*, at 31; Stephen Greenspan, James C.O. Harris, & George Woods, *Intellectual Disability Is "A Condition, Not a Number": Ethics of IQ Cut-offs in Psychiatry, Human Service, and Law*, 1 Ethics, Med. & Pub. Health 312 (2015).

FASD refers to neurodevelopmental disorders caused by prenatal exposure to alcohol that are both lifelong and congenital. A person is diagnosed with FASD only after undergoing a multidisciplinary assessment conducted by a neuropsychological, medical doctor, and psychologist to determine adaptive functioning and neurocognitive deficits. Natalie Novick Brown, et al., *Prenatal Alcohol Exposure: An Assessment Strategy for the Legal Context*, 42 Int'l J. L. & Mental Health 144 (2015); Natalie Novick Brown, et al., *A proposed Model Standard for Forensic Assessment of FASD*, 38 J. Psy. & L. 383 (2010). Clinicians also ascertain that there is verified pre-natal alcohol exposure and deficits manifesting in childhood that continue during the developmental period before giving a FASD diagnosis. APA, *Diagnostic and Statistical Manual of Mental Disorders* (5th ed., text rev.) (2022). Possible diagnoses within the spectrum include Static Encephalopathy, Alcohol Exposed (SE/AE). Criteria for diagnosing SE/AE, which refers to "permanent or unchanging brain damage" as a result of alcohol exposure in utero, include structural/neurological deficits below the third percentile (such as poor motor skills,

delayed speech, and short stature), adaptive functioning at least two standard deviations below the mean in two or more domains, and verified pre-natal alcohol exposure. *See* Appendix E in U.S. Department of Health and Human Services, Addressing Fetal Alcohol Spectrum Disorders (FASD) 172–74 (2014).

The similarities between FASD and intellectual disability are extensive. Medical consensus recognizes that FASD presents impairments in adaptive behavior and executive functioning that are equivalent to those associated with intellectual disability. *See* Natalie Novick Brown & C.R. Reynolds, *Connecting the Dots: Functional Behavior Evaluation* in Evaluating Fetal Alcohol Spectrum Disorders (FASD) in the Forensic Context (2021). Both are defined by disordered thinking and an inability to adapt to changing environments. *See* Anastasia Hronis, et al., *A Review of Cognitive Impairments in Children with Intellectual Disability: Implications for Cognitive Behvioural Therapy*, 56 British J. Clin. Psy. 189 (2017); H. Carmichael Olson, et al., *Neuropsychological Deficits in Adolescents with Fetal Alcohol Syndrome; Clinical Findings*, 22 Alcoholism: Clinical and Experimental Research 8 (1998). Further, behaviors associated with both conditions are typified by an inability to recognize or avoid risk when taking a course of action. *See* K. Wyper & J. Pei, *Neurocognitive Difficulties Underlying High Risk and Criminal Behaviour in FASD: Clinical Implications* in Nelson & Trussler, *supra*; Natalie Novick Brown & Stephen Greenspan, *Diminished Culpability in Fetal Alcohol Spectrum Disorders*,

39 Behav. Sci. & L. 1 (2021); Lisa Christensen & Bruce L. Baker, *Risk-taking and Delinquent Behaviors Among Youth with and Without Intellectual Disabilities*, 13 J. Mental Health & Res. in Intellectual Disabilities 1 (2020).

Beyond the similarities in presentation, clinical responses to FASD and intellectual disability are equivalent. People with FASD frequently have support needs that are comparable to those of people with intellectual disability. *See* Greenspan et al., *supra*, at 241. Further, while FASD and intellectual disability are lifelong conditions, both are amenable to interventions that mitigate the disorder's effects. Stephen Greenspan, et al., *Determining Disability Severity Level for Fetal Alcohol Spectrum Disorder: Assessing the Extent of Impairment* in Evaluating Fetal Alcohol Spectrum Disorders (FASD) in the Forensic Context (2021).

### C. In Line with Current Medical Consensus, States Must Recognize That FASD Is Functionally Equivalent to Intellectual Disability

Current medical standards are clear: FASD is an ID-equivalent disorder that presents commensurate adaptive deficits to intellectual disability. The equivalences in presentation, manifestation, and response between FASD and intellectual disability hold even when a person with FASD has an IQ above 75. *See generally* Natalie Novick Brown, *Fetal Alcohol Spectrum Disorders (FASD): Intellectual Disability Equivalence* in Nelson & Trussler, *supra*. Because behavioral impairments define both disorders, the established medical consensus is that an IQ score should not be the point of emphasis for either diagnosis. *See* Woods &

Greenspan, *supra*, at 110. There is, thus, no rationale for states to distinguish between FASD and intellectual disability when applying the protections of *Atkins*.

## II. THE STATE COURT IGNORED THE MEDICAL CONSENSUS THAT FASD IS FUNCTIONALLY EQUIVALENT TO INTELLECTUAL DISABILITY

In adjudicating Mr. Bryant's case, the state court failed to consider the effects of FASD and the severe adaptive deficits it produces. In so doing, the court failed to account for current medical consensus that FASD is an ID-equivalent disorder that produces commensurate deficits to intellectual disability, irrespective of IQ score. The state court, as well as the district court should have acknowledged the equivalence of these two developmental disabilities and recognized that applying current medical consensus shields Mr. Bryant from execution.

## III. MR. BRYANT'S FASD DIAGNOSIS MUST EXEMPT HIM FROM EXECUTION

### A. Mr. Bryant Has Been Diagnosed With FASD, an ID-Equivalent Disorder

Multiple experts have concluded that Mr. Bryant lives with FASD and have diagnosed him with SE/AE. Mr. Bryant's mother drank and used drugs throughout her pregnancy. JA 529. This gestational alcohol exposure has severely impaired Mr. Bryant: neuropsychiatric and psychological reports conclude that he has the physical stigmata of FASD, as well as significant cognitive and adaptive deficits. JA 528.

Mr. Bryant's neurological examination revealed multiple physical signs that are consistent with in utero alcohol exposure. His facial features, including this thin

upper lip and philtrum, are indicative of alcohol-related neurodevelopmental disorders—the acquisition of such features occurs in a limited period during the first trimester of pregnancy. JA 534. Further, Mr. Bryant was unusually short as a child and even now he remains in the lowest 10th percentile, consisted with prenatal alcohol exposure. *Id.*

Mr. Bryant's neuropsychological functioning is also consistent with FASD. As a child, he had developmental delays in his motor skills and speech. Even today, he has limited vocabulary. JA 531. Two clinicians have noted impairments in Mr. Bryant's fine motor speed and a lack of coordination in both hands, which is consistent with decreased corpus colossal functioning. JA 534. He also has poor facial recognition, a cognitive skill seen in adolescence that disappears with brain maturity, and his olfactory deficits demonstrate impaired frontal lobe and executive function. *Id.* Mr. Bryant's neuropsychiatric examination concluded that he has a configuration of olfactory impairment, visual memory deficit and mild frontal system dysfunction—all of which is consistent with disruption of these developmental processes in utero. *Id.*

Mr. Bryant's adaptive deficits as a result of FASD are significant. While his IQ scores are marginally above those required to meet the criteria for intellectual disability, they say little about his ability to function in the world. His adaptive functioning scores, by contrast, indicate his significant impairments in carrying out

day-to-day activities and place him in the intellectual disability range of functioning. JA 535. Mr. Bryant's performances on multiple adaptive functioning tests— including the Adaptive Behavior Assessment System-3 (ABAS), the Test of Adolescent and Adult Language-Fourth Edition (TOAL-4), the Independent Living Scales (ILS), and the Math Computation subtest of The Wide Range Achievement Test, Fourth Edition (WRAT4)—reveal poor scores. Mr. Bryant's computational skills are at 3rd and 4th grade level. His language scores are not only two standard deviations below the mean—they are in the first percentile. And his functional academics are well below the two standard deviations required for him to meet the intellectual disability standard for impaired adaptive function. *Id.*

Mr. Bryant's social history also establishes significant deficits in adaptive skills. He was socially isolated growing up, did not have friends, and never dated. JA 529–30. He could not—and cannot—make day-to-day decisions on his own. JA 535. His first-grade teacher reported that he could not read and was not learning, so he had to repeat the first grade. JA 530. Mr. Bryant was eventually promoted to middle school without merit and without the requisite skills to make progress. *Id.* He had significant problems with mathematics in particular, and continues to have trouble remembering names and numbers. *Id.* Today, he cannot report his full date of birth, nor can he follow multi-step commands. *Id*. As neuropsychiatrist Dr. George Woods notes in his report, Mr. Bryant's history is consistent with impaired

conceptual and practical domain functioning, which [is] consistent with the adaptive dysfunction seen in intellectual disability." JA 535.

In sum, neurological, neuropsychological, and adaptive functioning evaluations establish that Mr. Bryant lives with FASD. His prenatal exposure to alcohol has resulted in significant impairments that are akin to those associated with intellectual disability. Mr. Bryant's FASD means that he functions as poorly as someone meeting the diagnostic requirements of intellectual disability, and his social and neuropsychological history demonstrates that he functioned at this level during his developmental period.

## B. Executing Mr. Bryant Would Defy the Penological Justifications Underpinning the Use of the Death Penalty

As the Supreme Court established in *Hall*, "[n]o legitimate penological purpose is served by executing a person with intellectual disability." *Hall* 572 U.S. at 708 (citing *Atkins*, 536 U.S. at 317, 320). To do so contravenes the Eighth Amendment because neither deterrence nor retribution is served by executing an intellectually disabled person. *Id.* at 709. Those with intellectual disability are "unable to make the calculated judgments that are the premise for the deterrence rationale" as they have "a 'diminished ability' to 'process information, to learn from experience, to engage in logical reasoning, or to control impulses . . . .'" *Id.* (quoting *Atkins*, 536 U.S. at 320). Similarly, "[t]he diminished capacity of the intellectually

disabled lessens moral culpability and hence the retributive value of the punishment." *Id.* (citing *Atkins*, 536 U.S. at 319).

The medical and scientific rationale for this prohibition applies to people, like Mr. Bryant, with FASD because of the equivalence between FASD and intellectual disability. Mr. Bryant's diminished ability to process information, make decisions, and learn from prior experience positions him squarely within the group of people contemplated by the Supreme Court in *Atkins* and its progeny as being exempt from execution due to their developmental disabilities. Indeed, in the clinical setting, "Mr. Bryant would be treated in the same fashion as someone with mild intellectual disability . . . ." JA 537. As would be the case in the clinic, courts should consider Mr. Bryant's FASD diagnosis as equivalent to intellectual disability.

## CONCLUSION

For all of the foregoing reasons, *amicus* respectfully submits that this court should vacate the district court's summary judgment grant and remand for review of Mr. Bryant's FASD claim.

April 9, 2024

Respectfully submitted,

JOHN R. MILLS
NATHALIE GREENFIELD
PHILLIPS BLACK, INC.
1721 Broadway, Suite 201
Oakland, CA 94612
888-532-0897
j.mills@phillipsblack.org

# CERTIFICATE OF FILING AND SERVICE

I hereby certify that on this the 9th day of April 2024, I caused this Brief of *Amicus Curiae* to be filed electronically with the Clerk of Court using the CM/ECF System, which will send notice of such filing to the following registered CM/ECF users:

Melody J. Brown
South Carolina Attorney General's Office
P.O. Box 11549
Columbia, SC 29211

E. Charles Grose, Jr.
Grose Law Firm, LLC
Greenwood, SC 29646

Gretchen L. Swift
Laura K. McCready
Assistant Federal Public Defenders
129 West Trade Street, Suite 300
Charlotte, NC 28202

Jonathan P. Sheldon
Sheldon & Flood, PLC
10621 Jones Street
No. 301-A
Fairfax, VA 22030

I further certify that on this 9th day of April 2024, I caused the required copies of the Brief of *Amicus Curiae* to be filed by sending them via USPS, postage prepaid, to the Clerk of the Court.

/s/ John R. Mills
*Counsel for Amicus Curiae*

1